Filed 2/22/18 (unmodified opn. attached)

## CERTIFIED FOR PUBLICATION

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TAMMY GUTIERREZ,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>CARMAX AUTO SUPERSTORES<br>CALIFORNIA, LLC,<br><br>    Defendant and Respondent. | F073215<br><br>(Super. Ct. No. CV283385)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING**<br><br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is hereby ordered that the opinion filed herein on January 30, 2018, be modified as follows:

1.      On page 2, the first full paragraph beginning with, "As to the alleged," is deleted and the following paragraph is inserted in its place.

> As to the alleged breach of the implied warranty of merchantability, we conclude Gutierrez failed to adequately allege facts showing the existence of the safety recall relating to the vehicle's stop lamp switch rendered the vehicle unfit for ordinary purposes.  Gutierrez did not allege the switch in her vehicle was actually defective and did not allege her use of the vehicle was restricted or impaired due to the recall.

2.      On page 7, the first word of line 2 of the second full paragraph, "implied" is deleted.

3.    On page 8, the last full paragraph beginning with, "Fourth, CarMax contends" is deleted.

4.    On page 12, line 3, the words "by the omissions" are changed to "due to the lack" so the end of that sentence reads:  "we experienced no inefficiencies due to the lack of repeated citations to the complaint."

5.    Beginning on page 12, subsections 1, 2, and 3 under heading "D. Implied Warranty Cause of Action" are deleted and the following sections and paragraphs are inserted in its place, which will require renumbering of all subsequent footnotes:

*1.    Elements of a Claim*

In generic terms, the elements of any cause of action are wrongdoing, causation and harm.  (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 [claims for strict liability, negligence and breach of implied warranty].)  Here the alleged wrongdoing is a breach of the implied warranty of merchantability imposed by the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.).  Under the circumstances of this case, which involves the sale of a *used* automobile, the element of wrongdoing is established by pleading and proving (1) the plaintiff bought a used automobile from the defendant, (2) at the time of purchase, the defendant was in the business of selling automobiles to retail buyers, (3) the defendant made express warranties with respect to the used automobile, and (4) the automobile was not fit for ordinary purposes for which the goods are used.[8]  (Civ. Code, §§ 1792, 1791.1, subd. (a)(2) [definition of implied warranty of merchantability]; 1795.5 [sale of used consumer goods]; see CACI No. 3210.)  Generally, "[t]he core test of merchantability is fitness for the ordinary purpose for which such goods are used." (*Atkinson v. Elk Corporation of Texas* (2006) 142 Cal.App.4th 212, 228.)

Stating a complete *cause of action* for a breach of the Song-Beverly Consumer Warranty Act's implied warranty of merchantability also requires the plaintiff to allege facts establishing the generic elements of causation and harm.  These elements are addressed by the statutory provisions that define the relief available for a breach of the implied

---

[8]    There are other ways to plead and prove this last element, but they are not relevant in this appeal.  (See Civ. Code, § 1791.1, subd. (a)(1), (3), (4); CACI No. 3210.)

warranty. For instance, Civil Code section 1791.1, subdivision (d) states: "Any buyer of consumer goods injured by a breach of the implied warranty of merchantability … has the remedies provided in Chapter 6 (commencing with Section 2601) and Chapter 7 (commencing with Section 2701) of Division 2 of the Commercial Code, and, in any action brought under such provisions, Section 1794 of this chapter shall apply."

Similarly, Civil Code section 1794, subdivision (a) states that "[a]ny buyer of consumer goods who is damaged by a failure to comply with any obligation … under an implied … warranty … may bring an action for the recovery of damages or other legal and equitable relief." In accordance with these provisions, the buyer of consumer goods must plead he or she was injured or damaged by the alleged breach of the implied warranty of merchantability.

In this appeal, the disputed elements of the cause action for a breach of the Song-Beverly Consumer Warranty Act's implied warranty of merchantability are whether Gutierrez has alleged sufficient facts to show (1) the Hyundai was not fit for ordinary purposes, (2) Gutierrez was injured, and (3) the injury was proximately caused by the alleged breach of the implied warranty.

### 2. *Alleging a Vehicle is Unfit for Ordinary Purposes*

Whether an automobile is fit for the ordinary purpose for which vehicles are used has been addressed in a number of decisions. For example, a vehicle that is inoperable is unfit for transportation, which is an ordinary purpose for which a vehicle is used. (*Jones v. Credit Auto Center, Inc.* (2015) 237 Cal.App.4th Supp. 1, 9.) However, a vehicle that is capable of providing transportation from point A to point B does not necessarily fulfill the implied warranty of merchantability. (*Isip v. Mercedes-Benz USA, LLC* (2007) 155 Cal.App.4th 19, 27 [upholding jury instruction that stated implied warranty required a vehicle that is "'in safe condition and substantially free of defects'"]; see *Hodges v. Johnson* (2009) 288 Kan. 56 [199 P.3d 1251] [used Mercedes breached implied warranty of merchantability because its air conditioner failed].) Based on the view that "an important consideration under the implied warranty is consumer safety," the Fourth District concluded a reasonable jury could find a vehicle sunroof that opens and closes on its own created a substantial safety hazard and, therefore, violated the implied warranty. (*Brand v. Hyundai Motor America* (2014) 226 Cal.App.4th 1538, 1547.) Consequently, the court reversed a judgment entered after the trial court granted the manufacturer's motion for nonsuit on the claim for breach of implied warranty of merchantability. (*Id*. at p. 1541.) For purposes of this appeal, we conclude

3.

allegations showing an alleged defect that created a substantial safety hazard would sufficiently allege the vehicle was not "fit for the ordinary purposes for which such goods are used" and, thus, breached the implied warranty of merchantability. (§ 1791.1, subd. (a)(2).)

### 3. Unfitness Due to the Safety Recall

First, we conclude the general assertions in the complaint that the Hyundai "was not fit for its intended use" and "was virtually useless due to safety defects" are not allegations of fact sufficient to state a breach of the implied warranty of merchantability. Gutierrez does not argue these general assertions are sufficient. Second, we conclude the allegation of the existence of a safety recall relating to a stop lamp switch, by itself, is insufficient to state facts showing that the vehicle was unfit for ordinary purposes. (Civ. Code, § 1791.1, subd. (a)(2); see generally, *Blanco v. Baxter Healthcare Corp.* (2008) 158 Cal.App.4th 1039, 1055, 1056.) In other words, the existence of the safety recall does not adequately allege a substantial safety hazard existed. Based on the foregoing conclusions, we turn to the other allegations of fact stated in the complaint and consider whether those allegations adequately show the Hyundai presented a substantial safety hazard.

The complaint's allegation that CarMax breached the implied warranty because the Hyundai was "was not fit for its intended use" was followed by the clause "as described above." The previous paragraphs in the complaint described mechanical problems and vehicle unreliability involving failures to accelerate, stalling, and inoperable steering. However, there were no allegations connecting these problems with the existence of the safety recall for the stop lamp switch. As noted by CarMax, there is no allegation that the switch was actually defective or failed to function before it was replaced. Furthermore, we located no allegation explaining how Gutierrez's use of the vehicle was restricted or otherwise affected by the existence of the safety recall. For example, Gutierrez did not allege she became aware of the safety recall on a particular date and thereafter was reluctant to drive the Hyundai due to safety concerns related to the stop lamp switch. Therefore, we conclude Gutierrez has failed to allege facts sufficient to show the Hyundai was unfit for ordinary purposes due to the safety recall.[9]

Gutierrez's petition for rehearing assumed she adequately alleged the Hyundai was unfit for ordinary purposes and addressed whether she is

---

[9]   On appeal, Gutierrez does not argue unfitness for ordinary purposes based on the alleged defects involving steering, stalling and hesitant acceleration.

4.

entitled to relief. Her arguments raise questions about the elements of injury and causation that we need not decide.

There is no change in the judgment.

Appellant's petition for rehearing filed on February 14, 2018, is hereby denied.

                                                    FRANSON, J.

I CONCUR:

MEEHAN, J.

I concur in the denial of the petition for rehearing:

POOCHIGIAN, A.P.J.

Filed 1/30/18 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TAMMY GUTIERREZ,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>CARMAX AUTO SUPERSTORES<br>CALIFORNIA, LLC,<br><br>    Defendant and Respondent. | F073215<br><br>(Super. Ct. No. CV283385)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Lorna H. Brumfield, Judge.

Law Office of Robert Starr, Robert Starr and Adam Rose for Plaintiff and Appellant.

Schlichter & Shonack, Kurt A. Schlichter, Steven C. Shonack, Jamie L. Keeton and William A. Percy for Defendant and Respondent.

-ooOoo-

Plaintiff Tammy Gutierrez sued defendant CarMax Auto Superstores California, LLC (CarMax) alleging breaches of express and implied warranties, intentional and negligent misrepresentation, breach of contract, unfair competition under Business and Professions Code section 17200 (UCL), and a violation of the Consumer Legal Remedies Act (CLRA; Civ. Code, § 1750 et seq.). CarMax demurred to Gutierrez's third amended

**SEE CONCURRING AND DISSENTING OPINION**

complaint and the trial court sustained the demurrer without leave to amend. Gutierrez appealed, contending her allegations about an undisclosed safety recall adequately stated causes of action for breach of an implied warranty of merchantability and violations of the UCL and CLRA.

As to the alleged breach of the implied warranty of merchantability, we conclude CarMax's express limitations on the remedies available apply to such a breach. Gutierrez obtained the remedy authorized under the contract and its limitations for a breach of warranty. Specifically, the potentially defective stop lamp switch subject to a safety recall was replaced at no charge for the parts and labor. Having obtained her contractual remedy, Gutierrez is unable to state of a cause of action for breach of an implied warranty.

In contrast, Gutierrez has alleged sufficient facts to establish CarMax engaged in unfair or deceptive practices in violation of the CLRA. Gutierrez alleged CarMax engaged in deceptive practices by (1) representing the vehicle passed a 125-point quality inspection and (2) failing to disclose the safety recall for the vehicle's stop lamp switch. She alleged the switch was a critical safety-related component of the vehicle's braking system and CarMax did not disclose the recall because it deemed making money more important than protecting its customers from dangers relating to serious safety recalls. As to the elements of reliance and the causation of harm, Gutierrez alleged she would not have purchased the vehicle if she had known its true condition, including recall history. Case law establishes this allegation adequately states Gutierrez suffered "any damage" as that term is used in the CLRA and, therefore, might be entitled to restitution under the statute. Also, the contractual limitations on remedies for a breach of warranty do not control or restrict the availability of restitution or other relief specified in the CLRA.

On the question whether Gutierrez pleaded sufficient facts to establish CarMax had a duty to disclose the safety recall, we conclude her allegations are sufficient. Gutierrez contends the duty to disclose existed because CarMax (1) had actual knowledge

2.

of the recall before the sale of the vehicle and (2) made partial representations about the vehicle that were misleading because the existence of the recall, a material fact, had not been disclosed. We conclude her allegations are sufficient to establish for pleading purposes the existence of the safety recall was a material fact and, by reasonable inference, the existence of CarMax's knowledge of the recall before the sale. As the stop lamp switch is related to the vehicle's braking and lighting systems, Gutierrez's allegations about the rigorous inspection of the vehicle's braking and lighting systems, and its misleading character in the absence of a disclosure about the safety recall, are sufficient to plead the remaining factual element of a duty to disclose. Therefore, we conclude she has alleged sufficient facts to state a claim for a deceptive practice actionable under the CLRA.

Gutierrez also has stated a cause of action under the UCL. We conclude the violation of the CLRA serves as the predicate violation of law necessary to establish the unlawful practice variety of unfair competition that is actionable under the UCL.

We therefore reverse the judgment of dismissal.

## FACTS

On May 6, 2013, Gutierrez purchased a 2008 Hyundai Elantra from defendant CarMax at its dealership in Bakersfield. The vehicle came with a 30-day limited warranty. The vehicle's purchase agreement stated:

> "The CarMax Warranty Brochure contains the details of the Limited Warranty.
>
> "LIMITATION OF WARRANTIES: CARMAX MAKES NO EXPRESS WARRANTIES UNLESS SEPARATELY SET FORTH IN WRITING. ANY AND ALL IMPLIED WARRANTIES APPLICABLE TO THE PRODUCTS SOLD HEREUNDER, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE LIMITED TO THE DURATION OF THE WRITTEN LIMITED WARRANTY GIVEN BY CARMAX, IF ANY."

3.

The document containing the limited warranty stated the duration of the warranty was 30 days and listed the systems covered. The document also stated: "The dealer will pay 100% of the labor and 100% of the parts for the covered systems that fail during the warranty period."

Before Gutierrez purchased the vehicle, she was advised by CarMax sales staff that the Hyundai was in excellent condition because it had passed a rigorous 125-point quality inspection. Gutierrez also received a document with the heading "CQI CarMax"[1] that stated: "This vehicle has passed the rigorous CarMax 125-Point Quality Inspection" and listed the 125 points. The following sentence appeared at the top of the document: "Your signed CQI certificate can be found in your vehicle's glove compartment."

At the time of the sale, the Hyundai was subject to a national recall relating to the stop lamp switch, which Gutierrez alleges was a critical safety-related component of the vehicle's braking system that materially affects a person's ability to operate the vehicle safely. She further alleges it is unsafe to operate a vehicle with a defective stop lamp switch, but has not alleged the switch on her vehicle malfunctioned or was actually defective.

CarMax did not disclose to Gutierrez that there was an outstanding safety recall relating to the stop lamp switch. The operative complaint does not explicitly address what CarMax knew about the recall at the time of sale. However, the complaint alleges CarMax "should have either disclosed to Gutierrez that the Hyundai was the subject of the recall, or had the safety recall work performed" and the *only* reason CarMax did not disclose the recall because it placed more importance on money than protecting its customers.[2] We conclude these allegations can be reasonably interpreted as implying

---

[1]     CQI stands for certified quality inspection.

[2]     Gutierrez's interpretation of her complaint has changed slightly during the course of this appeal. Initially, her opening brief addressed CarMax's knowledge by stating that CarMax made the representation about the vehicle passing the quality inspection "either

CarMax actually knew the recall had been issued when it sold the Hyundai to Gutierrez. (See Code Civ. Proc., § 452 [construction of pleadings]; *Mendoza v. Continental Sales Co.* (2006) 140 Cal.App.4th 1395, 1401-1402 [when construing a complaint, court assumes the truth of facts that (i) can be inferred reasonably from the allegations and exhibits and (ii) are favorable to the plaintiff].)

Shortly after Gutierrez purchased the vehicle, it began having transmission problems, which included making a grinding noise and failing to accelerate in traffic. Gutierrez presented the vehicle to CarMax for repairs on June 7, 2013.  The transmission problem was a known defect for which Hyundai had issued a technical service bulletin. The June 7, 2013, repair order stated (1) the stop lamp switch was replaced because of recall campaign 110 and (2) the transmission failed a bulletin's stall test in second gear and the bulletin advised to replace the transmission.  As advised in the bulletin, the transmission was replaced.[3]

## PROCEEDINGS

In November 2014, Gutierrez prepared and filed a complaint against CarMax using a form complaint approved by the Judicial Council of California.  Demurrers to her first and second amended complaints were filed and sustained with leave to amend.

---

knowing that there was an open safety recall, or knowing that Carmax did not investigate whether or not there was an open safety recall."  Subsequently, Gutierrez's reply brief asserted "CarMax knew about the stop lamp switch recall for Gutierrez's vehicle but did not disclose it."

[3]     Multiple paragraphs of the complaint allege "the vehicle was never properly repaired, and the herein mentioned problems were never resolved" despite Gutierrez's attempts to have it repaired.  Gutierrez's opening brief does not mention the failure to repair as the factual basis for an adequately alleged cause of action and, consequently, we do not consider whether Gutierrez's allegations about the failure to repair the transmission or the stop lamp switch are sufficient to state a cause of action.

In October 2015, Gutierrez's attorney prepared and filed the third amended complaint (complaint), which is the operative pleading in this appeal. In November 2015, CarMax filed another demurrer.

At a January 14, 2016, hearing, the trial court sustained the demurrer without leave to amend and directed CarMax to give notice of the order. The order stated the complaint failed to allege sufficient facts to constitute (1) a breach of warranty, (2) a misrepresentation that was not remedied or limited by the terms of the express warranty, or (3) a breach of contract. The order explained these conclusions by stating:

> "The warranty was expressly limited to 30 days, and all the alleged misrepresentations [Gutierrez] complains of, were disclaimed by the warranty, or could not be reasonably relied upon due to the time limitations of the warranty. Since [Gutierrez] failed to present the subject vehicle for repair until after the warranty expired, no breach of a duty or contractual obligation, and no misrepresentation or reliance has yet to be sufficiently pleaded, and likely cannot be pleaded from the facts as alleged in the four attempts in this case."

The order also stated Gutierrez had not presented any facts or allegations that would cure the defects apparent on the face of the pleadings and, consequently, leave to amend was denied. In February 2016, Gutierrez filed a notice of appeal.

## DISCUSSION

### I.   STANDARD OF REVIEW FOR DEMURRERS

When a demurrer is sustained, appellate courts conduct a de novo review to determine whether the pleading alleges facts sufficient to state a cause of action under any possible legal theory. (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 870 (*Dinuba*); *Villery v. Department of Corrections & Rehabilitation* (2016) 246 Cal.App.4th 407, 413 (*Villery*).) Appellate courts treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law. (*Ibid*.) The pleader's contentions or conclusions of law are not

controlling because appellate courts must independently decide questions of law without deference to the legal conclusions of the pleader or the trial court. (*Ibid.*)

Legal questions include the interpretation of a statute and the application of a statutory provision to facts assumed to be true for purposes of the demurrer. (*Villery*, *supra*, 246 Cal.App.4th at p. 413.) In this appeal, all three legal theories raised by Gutierrez involve statutes.

## II. BREACH OF IMPLIED WARRANTY

### A. Contentions of the Parties

#### 1. *Gutierrez's Legal Theory*

Gutierrez contends the breach of implied warranty cause of action is based on the implied warranty of merchantability that is implied in every contract for the sale of consumer goods by Civil Code section 1792.[4] Gutierrez contends goods are "merchantable" if they are fit for the ordinary purposes for which such goods are used. Gutierrez further contends the ordinary purpose of a vehicle is safe driving and, therefore, a vehicle is not merchantable when it is not fit for safe driving.[5]

Applying this legal theory to her vehicle, Gutierrez argues the Hyundai was not merchantable when sold to her because "it had the unresolved and undisclosed stop lamp switch issue" identified in the safety recall. In Gutierrez's view, this breach of the implied warranty of merchantability occurred at the time of sale and, as a result, the cause

---

**4** Civil Code section 1792 states: "Unless disclaimed in the manner prescribed by this chapter, every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable."

**5** Gutierrez supports this point by citing a federal safety standard for motor vehicles that provides vehicles must have adequate, functioning lights (49 C.F.R. § 571.108) and the discussion of the implied warranty of merchantability in *American Suzuki Motor Corp. v. Superior Court* (1995) 37 Cal.App.4th 1291 at page 1296.

7.

of action does not depend on the timing of her discovery of (1) the safety recall or (2) CarMax's failure to fix the vehicle as specified in the recall.

### 2. CarMax's Contentions

CarMax challenges Gutierrez's cause of action for breach of an implied warranty on multiple grounds. First, CarMax contends the theory that the vehicle was not merchantable because of the unresolved and undisclosed stop lamp switch issue is a new theory of liability set forth for the first time on appeal. Thus, CarMax argues Gutierrez has waived her "claim that the recall rendered the vehicle unmerchantable."

Second, CarMax contends Gutierrez "wholly fails to cite to the record and presents no cognizable legal argument to show that the recall was a violation of the implied warranty under any theory." CarMax argues this failure to present specific argument on the issue also operates as a waiver.

Third, CarMax contends the breach of implied warranty claim is deficient because there is no allegation that the recall affected the vehicle's usability. CarMax notes Gutierrez did not allege the stop lamp switch on her vehicle was actually defective or did not function properly, but only alleged there was an outstanding recall. CarMax contends, "An outstanding recall, by itself, does not render a product unfit for use." Thus, in CarMax's view, the cause of action must include allegations showing there were problems with the specific vehicle that rendered it unfit for ordinary purposes, rather than showing a precautionary replacement of a properly functioning part. In addition, CarMax contends the stop lamp switch was replaced at no cost to plaintiff in accordance with the limitations on remedies for breach of warranties specified in the contract.

Fourth, CarMax contends the implied warranties expired on June 5, 2013, which was 30 days after the May 6, 2013, purchase date. CarMax contends Gutierrez did not *present* the vehicle for repair until June 7, 2013, by which time the implied warranties had expired.

8.

B.  Demurrers and New Legal Theories on Appeal

1.  *General Rule*

CarMax relies on the general rule "'that issues not raised in the trial court cannot be raised for the first time on appeal.'" (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 603; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 400 [point not properly raised below].)  The cases cited by CarMax—*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211 and *Reyes v. Kosha* (1998) 65 Cal.App.4th 451—arose in the procedural context of a denial of a petition for writ of mandate and motion for summary judgment, respectively.  These cases are of little precedential value in the present appeal because the rule about raising new issues on appeal was not applied to the review of a general demurrer.[6]

2.  *Rule Applicable to Demurrers*

CarMax's reliance on the general rule is contrary to the precedent established by the California Supreme Court, which is binding on this court and all state trial courts. The Supreme Court has repeatedly stated that appellate courts reviewing a general demurrer make a de novo determination of whether the complaint alleges "facts sufficient to state a cause of action under *any possible legal theory*." (*Dinuba*, *supra*, 41 Cal.4th at p. 870, italics added; *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [any possible legal theory].)  The term "any" is a broad term that ordinarily means "'of whatever king'" or "'without restriction.'" (*Zabrucky v. McAdams* (2005) 129 Cal.App.4th 618, 628.)  Here, we presume the Supreme Court understood this meaning and note the court did not add any restrictions following its phrase "any possible legal theory."  For instance, the court did not refer to any possible legal theory *raised in the*

---

[6]  Generally, attorneys should "think carefully about the persuasive force of the precedent" cited in a brief.  (Herrmann, The Curmudgeon's Guide to Practicing Law (ABA 2006) 4.)  Here, the cases with the most persuasive force are those that address raising new legal theories on appeal *in the procedural context presented in this case*—that is, where a demurrer has been sustained without leave to amend.

*trial court*.  Indeed, the Supreme Court rejected restrictions of this type when, immediately after mentioning "any possible legal theory," it stated:  "We are not limited to plaintiffs' theory of recovery or '"form of action"' pled in testing the sufficiency of the complaint." (*Dinuba*, *supra*, at p. 870.)**7**

Accordingly, the "any possible legal theory" standard encompasses a legal theory presented for the first time in an opening appellant's brief.  The standard also includes legal theories first raised by the reviewing court.  (E.g., *Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist.* (2003) 113 Cal.App.4th 597, [Fifth District vacates order sustaining demurrer after determining the facts alleged stated a violation of the right to equal protection—a legal theory first raised by the court in a request for supplemental briefing under Gov. Code, § 68081].)  In short, an appellate court "may consider new theories on appeal from the sustaining of a demurrer." (*Simpson v. The Kroger Corp.* (2013) 219 Cal.App.4th 1352, 1367.)  CarMax's argument to the contrary misstates California law.

Consequently, we conclude Gutierrez did not waive, forfeit or abandon the legal theory that the existence of an undisclosed and unresolved safety recall constitutes a breach of the implied warranty of merchantability.

C.     Alleged Deficiencies in Gutierrez's Brief

*1.     Insufficient Argument and Legal Authority*

CarMax argues that consideration of Gutierrez's legal theory is barred because her "brief also violates subsection (a)(1)(A) of [California Rules of Court] rule 8.883 by

---

**7**     A contrary rule of law would be difficult to harmonize with the Legislature's approach to showings of the ability to cure a defective pleading by alleging additional facts.  (See Code Civ. Proc., § 472c, subd. (a).)  Our Supreme Court has interpreted the statute to mean:  "The issue of leave to amend is always open on appeal, *even if not raised by the plaintiff*." (*City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 746-747, italics added.)  Under this statutory interpretation, a proposed amendment can be presented for the first time on appeal.

failing to provide substantive legal argument on the issues pertinent to this appeal supported by citation to relevant legal authority." We reject this argument.

First, the cited rule applies to the appellate division of the superior court, not to the Court of Appeal. (See Cal. Rules of Court, rule 8.800(a).) Second, Gutierrez has provided substantive legal argument regarding the legal theory that the existence of the undisclosed and unresolved safety recall constituted a breach of the implied warranty of merchantability. She has cited the statutory provision that imposes the implied warranty, referred to the standard that the goods sold must be fit for ordinary purposes, and argued that a vehicle subject to a safety recall is not fit for the ordinary purpose of safe driving. Third, the lack of a citation to legal authority supporting her *specific* argument for when a vehicle is not fit for ordinary purposes does not violate the rules governing appellate briefs. Such a citation to authority is required "if possible." (Cal. Rules of Court, rule 8.204(a)(1)(B).) This rule does not bar appellants from presenting (or this court from considering) novel legal theories not explicitly considered or adopted in a published opinion.

### 2. *Citations to the Record*

CarMax also argues Gutierrez's opening brief wholly fails to cite to the record in the argument section and, as a result, this court should deem her to have waived those arguments. This court has recognized that California Rules of Court, rule 8.204(a)(1)(C) requires any reference to a matter in the record be supported by a citation to the volume and page number of the record where the matters appears. (*Sky River LLC v. Kern County* (2013) 214 Cal.App.4th 720, 741.) In addition, this court has concluded the requirement "applies to matter[s] referenced at any point in the brief, not just in the statement of facts." (*Ibid.*)

In this case, however, we will not treat Gutierrez's failure to include citations to her complaint and its exhibits as constituting a waiver or forfeiture. The court became

11.

familiar with the complaint and its exhibits in the course of its review and, as this appeal is narrowly focused on whether the operative pleading stated a cause of action, we experienced no inefficiencies by the omissions of repeated citations to the complaint. Consequently, we will exercise our discretionary authority such that the omissions of citations to the record are not deemed a waiver or forfeiture of the related arguments.

### D.     Implied Warranty Cause of Action

#### 1.     *Elements of a Claim—Implied Warranty of Merchantability*

CACI No. 1231 sets forth the essential factual elements of a cause of action for breach of the implied warranty of merchantability. If these elements are applied to the facts of this case, Gutierrez must prove that (1) she bought the Hyundai from CarMax; (2) at the time of purchase, CarMax was in the business of selling vehicles; (3) the Hyundai was not fit for the ordinary purposes of which such goods are used; (4) Gutierrez took reasonable steps to notify CarMax within a reasonable time that the Hyundai did not have the expected quality; (5) Gutierrez was harmed; and (6) the failure of the Hyundai to have the expected quality was a substantial factor in causing Gutierrez's harm.

The elements that are subject to dispute on appeal are whether Gutierrez has alleged sufficient facts to show (1) the Hyundai was not fit for ordinary purposes, (2) Gutierrez was harmed, and (3) the harm was proximately causes by the breach of the implied warranty. In addition, CarMax argues the express and implied warranties lasted only 30 days and, therefore, any implied warranties had expired by the time Gutierrez brought the Hyundai in for repair on June 7, 2013.

#### 2.     *Duration of Implied Warranty*

The duration of CarMax's limited warranty was 30 days and the warranty documents clearly stated the implied warranty of merchantability was limited to the duration of CarMax's written limited warranty. This limitation on the duration of an implied warranty is authorized by Civil Code section 1795.5, subdivision (c).

12.

The question presented by CarMax's argument is whether the purchaser must notify the seller of the breach of the implied warranty during the warranty period or, alternatively, whether the purchaser is allowed to provide notice after the warranty period has expired so long as the breach occurred during the warranty period. We reject CarMax's argument that Gutierrez was required to present the vehicle to CarMax during the warranty period. This argument is contrary to the express language of the warranty itself. The warranty states: "The dealer will pay 100% of the labor and 100% of the parts for the covered systems *that fail during the warranty period.*" (Italics added.) This language does not require presentation of the claim during the warranty period. Instead, it covers a breach of the warranty that occurs during the warranty period.

Applying this interpretation of the warranty to the facts of this case, we conclude the alleged breach of the implied warranty (i.e., the existence of an unresolved safety recall) existed during the warranty period. It is not a problem that first cropped up after the warranty had expired. Therefore, CarMax's argument about the duration of the warranty does not preclude Gutierrez from stating a cause of action for breach of the implied warranty of merchantability.

### 3. *Warranty's Limitations as to Remedy*

Immediately below the language in the purchase agreement that limited the duration of the implied warranties to the same duration as the written limited warranty given by CarMax, the purchase agreement stated: "To the extent allowed by applicable law, CarMax shall not be liable for any damages relating to loss of use of the products, loss of time, inconvenience or commercial loss, or any other incidental or consequential damages." This language reinforces the language of the limited warranty that stated CarMax "will pay 100% of the labor and 100% of the parts for the covered systems that fail during the warranty period." The combined effect of the language in the purchase agreement and the terms of the limited warranty is to limit the remedies available to

Gutierrez for a breach of the implied warranty of merchantability to the repair of the vehicle so that it complies with the warranty.

Here, the allegations in the earlier pleadings and the repair order attached to the complaint establish that the stop lamp switch was replaced after Gutierrez presented the vehicle on June 7, 2013. The repair order does not list a price charged, but has the word "warranty" in the column for the amount charged for the services listed. Consequently, Gutierrez has obtained the contractually specified remedy for the alleged breach of implied warranty. As a result, we conclude Gutierrez cannot state a cause of action for breach of the implied warranty of merchantability. The alleged breach of the implied warranty was fixed when the stop lamp switch was replaced and the express limitations on the remedies available for a breach of a warranty preclude Gutierrez from obtaining additional relief under this legal theory.

III.     CONSUMER LEGAL REMEDIES ACT

A.     Unfair and Deceptive Acts and Practices

1.     *Statutory Text*

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices" in transactions involving the sale of goods or services to any consumer. (Civ. Code, § 1770.) Gutierrez relies on paragraphs (5), (7) and (9) of subdivision (a) of Civil Code section 1770, which prohibit "[r]epresenting that goods … have … characteristics [or] benefits ... that they do not have"; "[r]epresenting that goods … are of a particular standard, quality, or grade … if they are of another"; and "[a]dvertising goods … with intent not to sell them as advertised." A question of statutory construction presented by this text is whether concealment, omissions or failures to disclose are prohibited.

14.

## 2. *Statutory Construction—Ambiguous or Plain Meaning*

California's rules of statutory interpretation are well established. (See *Merced Irrigation Dist. v. Superior Court* (2017) 7 Cal.App.5th 916, 924-926.) The first question is whether the statutory language is ambiguous—that is, susceptible to more than one reasonable interpretation—or, alternatively, has a plain meaning. (*Id.* at pp. 924-925.) Here, a dispute has arisen over whether the action verb "representing" is ambiguous or has a plain meaning.

One view is that "representing" has a plain meaning, which includes making oral and written statements and excludes omitting or failing to disclose information. A different view is that "representing" is ambiguous because, in certain contexts, representations can be expressed in words (i.e., oral or written) and also can be implied.[8]

Dictionaries are one place to look for a word's usual, ordinary meaning. (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122.) Webster's defines the verb "represent" as "'[t]o bring clearly before the mind: [to] cause to be known …: [to] present esp. by description.'" (*U.S. v. Alvarez* (9th Cir. 2010) 617 F.3d 1198, 1238.) A subsequent definition states "to describe as having a specified character or quality." (Webster's 3d New Internat. Dict. (1993) p. 1926.) These definitions do not address the distinction between expressed and implied statements. The related term "representation" means "[a] presentation of fact—either by words or by conduct—made to induce someone to act, esp. to enter into a contract." (Black's Law Dict. (9th ed. 2009) p. 1415.)

We conclude the statutory term "representing" is ambiguous and does not have single plain meaning. It is possible to interpret "representing" narrowly to mean

---

[8] By way of comparison, contracts can be express or implied. (BAJI No. 10.56 [express or implied contracts].) "Express" contracts are stated in words, either oral or written. (Civ. Code, §§ 1620, 1622; BAJI No. 1057 [oral and written contracts].) "Implied" contracts are manifested by conduct or implied in law. (*Weitzenkorn v. Lesser* (1953) 40 Cal.2d 778, 794; BAJI No. 10.56; Civ. Code, § 1621 [implied by conduct].)

presenting written or oral statements of fact to another, which interpretation excludes omissions of fact or nondisclosures. For example, the tort of negligent misrepresentation *usually* "exclude[s] liability for mere nondisclosure or other failure to act." (*Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1084.) In contrast, "representing" also can be reasonably interpreted as encompassing statements of fact that are express, implied-in-fact or implied-in-law.[9] Under this broader interpretation, placing the modifiers "actually" or "affirmatively" before the verb "represents" is not superfluous because the modifiers address the word's ambiguity and reduce the probability that the modified verb would be interpreted to include implied representations. (See *Randi W.*, *supra*, 14 Cal.4th at p. 1084 [affirmative representations in recommendation letter strongly implied school administrator was fit to interact appropriately with female students, which was a misleading half-truth; demurrer to negligent misrepresentation claim should have been overruled]; *People v. Fedalizo* (2016) 246 Cal.App.4th 98, 107 [courts routinely rely on the express and implied representations of attorneys on a wide range of matters].)

When statutory language is ambiguous, the court must adopt the interpretation that best effectuates the legislative intent or purpose. (*Beal Bank, SSB v. Arter & Hadden, LLP* (2007) 42 Cal.4th 503, 508.) In identifying the best interpretation, courts may consider a variety of extrinsic sources. (*Ibid*.)

### 3. Other Statutory Provisions

Ambiguous statutory language is construed in context—that is, it must be read in conjunction with the other words of the section and in light of the statutory scheme as a

---

**9** An example of a representation implied-in-law involves the duty to disclose a material fact. If a defendant subject to such a duty does not disclose the material fact, the defendant has impliedly represented that the material fact—usually negative information about the good being purchased—does not exist. This implication arises by virtue of the law that created the duty to disclose the material fact.

16.

whole. (*Merced Irrigation Dist. v. Superior Court*, *supra*, 7 Cal.App.5th at p. 925.) Accordingly, we consider the other language in Civil Code section 1770 and other provisions of the CLRA, as those provisions might aid our resolution of the ambiguity.

Civil Code section 1770 expressly prohibits the failure to provide particular types of information. The advertising of furniture "without clearly indicating" it is unassembled or the assembled price (if available assembled) is prohibited. (Civ. Code, § 1770, subd. (a)(11), (12).) "Advertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement *discloses* a limitation of quantity" is prohibited, which is only place the word "disclose" or its variants is used in Civil Code section 1770. (*Id*., subd. (a)(10), italics added.) Other provisions prohibit (1) advertising a specific price plus percentage markup unless other pricing information is included and (2) disseminating unsolicited prerecorded telephone messages that do not first provide information specified in the statute. (*Id*., subd. (a)(20), (22).)[10]

Other statutory text relevant to our construction of the provisions Gutierrez has alleged were violated is the Legislature's express statement of the CLRA's purposes:

> "This title shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." (Civ. Code, § 1760, italics added.)

The reference to "efficient and economical procedures" is somewhat ambiguous in scope. It could be intended to refer to procedures that are efficient and economical to the consumer seeking the CLRA's protection. Alternatively, the CLRA could be concerned with efficiency and economy on a broader, societal scale—that is, for all persons and entities involved in consumer transactions. Under this broader perspective, courts would

---

[10] These provisions demonstrate the Legislature was capable of explicitly addressing failures to provide information and, thus, support the inference that the Legislature did not intend the provisions at issue in this appeal to reach omissions and failures to disclose information. (*Blankenship v. Allstate Ins. Co.* (2010) 186 Cal.App.4th 87, 94-95.)

17.

weigh any inefficiencies a particular statutory construction might create for scrupulous businesses and balance those inefficiencies (i.e., burdens) against the protection (i.e., benefits) provided to consumers. Therefore, the Legislature's expression of the CLRA's purposes is ambiguous, which creates uncertainty in how to interpret the statute. (See *Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135 [fundamental goal of statutory interpretation is to effectuate the purpose of the statute].)

### 4. *Legislative History*

The ambiguity about efficient and economical procedures is not addressed in the Legislative Counsel's Digest for the bill enacting the CLRA, which states in full: "Enacts [CLRA] which provides specific legal remedies for consumers who suffer damage as a result of method, act, or practice declared to be unlawful by the act." (Legis. Counsel's Dig., Assem. Bill No. 292, 2 Stats. 1970 (Reg. Sess.) Summary Dig., p. 223; see *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066, 1099 [this summary is relevant to interpretation of CLRA].)

Other materials in the legislative history from the year of the CLRA's enactment, provide a stronger foundation for drawing inferences about the legislative purpose. One report states the act was designed "'to provide affirmative remedies for consumers which will protect them from unscrupulous business practices while insulating responsible businessmen from spurious or vexatious lawsuits.' (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 292 (1970 Reg. Sess.) Sept. 23, 1970.)" (*Benson v. Southern California Auto Sales, Inc.* (2015) 239 Cal.App.4th 1198, 1205.) This statement supports the view that an appropriate interpretation of the CLRA takes into account efficiency and economy from a societal perspective and is not limited to consideration of what is efficient and economical for the consumer. We resolve the ambiguity in the Civil Code section 1760 as to purpose by adopting the broader, societal perspective because the CLRA was "a product of intense extended negotiation with representatives of virtually all segments of

18.

the business community and, not unnaturally under such circumstances, is a compromise." (Reed, *Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act* (1971) 2 Pacific L.J. 1, 8, fn. omitted.)

Next, we consider whether the CLRA's legislative history is useful in determining whether the provisions invoked by Gutierrez should be construed to prohibit omissions or nondisclosures of fact. The materials we have reviewed are not definitive and can be used to support conflicting inferences on the nondisclosure question. One report gave an example of how each of the 16 subdivisions of Civil Code section 1770 enacted in 1970 could be violated. (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 292 (1970 Reg. Sess.) Sept. 23, 1970.)[11] The example for the provision that is now subdivision (a)(6) of Civil Code section 1770[12] is the only example that refers to the failure to disclose information, and it states: "It would be a deceptive practice for a salesman to *fail to disclose* that products are reprocessed even though the reprocessed products are as good as new. FTC v. Colgate Palmolive, 85 S. Ct. 1035."[13] (Assem. Com. on Judiciary, Rep.

---

[11] This report is reproduced as Appendix B to Reed, *Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act*, *supra*, 2 Pacific L.J. at pages 25 through 26.

[12] The text of this provision, which has not been altered since its adoption in 1970, prohibits: "Representing that goods are original or new if they have deteriorated unreasonably or are altered, reconditioned, reclaimed, used, or secondhand."

[13] In *FTC. v. Colgate-Palmolive Co.* (1965) 380 U.S. 374, the court considered a television advertisement for Rapid Shave shaving cream in which the announcer stated, "'To prove RAPID SHAVE'S super-moisturizing power, we put it right from the can onto this tough, dry sandpaper. It was apply … soak … and off in a stroke.'" (*Id*. at p. 376.) The advertisement did not show actual sandpaper; instead, it used a mock-up or simulated prop made of plexiglass to which sand had been applied. (*Ibid*.) If sandpaper had been used, it would have required a substantial soaking period of about 80 minutes. (*Ibid*.) The Federal Trade Commission found the undisclosed use of a plexiglass substitute for sandpaper was a material misrepresentation and, thus, a deceptive act that violated section 5 of the Federal Trade Commission Act. (*FTC. v. Colgate-Palmolive Co.*, *supra*, at pp. 375-376, 377.) The Supreme Court upheld the finding, stating "the undisclosed use of plexiglass in the present commercials was a material deceptive

19.

on Assem. Bill No. 292 (1970 Reg. Sess.) Sept. 23, 1970, italics added.) This example supports the inference that the Legislature was aware that the terms "deceptive act" and "representing" used in the CLRA could be interpreted to include the failure to disclose information about the goods being sold.

### 5. Statutes and Case Law Existing in 1970

A principle of statutory construction states the Legislature is deemed to be aware of existing statutes and judicial decisions when it adopts a statute. (*People v. Harrison* (1989) 48 Cal.3d 321, 329.) Under this principle, we consider some of the statutes and case law in place in 1970 when the CRLA was enacted.

The existing statutes included the Civil Code provisions adopted in 1872 to define fraud and deceit. (Civ. Code, § 1572 [fraud], 1710 [deceit].) Both these definitions encompass omissions and nondisclosures. Deceit includes the "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." (Civ. Code, § 1710, subd. 3.) Fraud includes "suppression of that which is true, by one having knowledge or belief of the fact." (Civ. Code, § 1572, subd. 3.)

Existing judicial decisions included *General Acc. etc. Corp. v. Indus. Acc. Com.* (1925) 196 Cal. 179, a case in which the California Supreme Court reviewed a workers' compensation award to the dependents of a deceased employee. (*Id*. at p. 181.) The litigation addressed whether an insurance policy was in effect or whether the employer would be responsible for paying the award. The specific issue was "whether or not the policy was obtained by fraudulent concealment of a material fact on the part of [the employer]" because, under the circumstances, the employer had a duty to disclose facts not known or suspected by the insurance company. (*Id*. at p. 186.) The court stated:

---

practice, independent and separate from the other misrepresentation found." (*Id*. at p. 390.)

20.

"Respondent Commission attempts to point out a distinction between a concealment of a material fact and a misrepresentation as to such fact. The legal effect in each instance amounts to the same thing, fraud.'"[14] (*Id*. at p. 190.) This decision provides a basis for inferring the Legislature was aware that the CLRA's reference to "unfair or deceptive acts" involving "representing" would be interpreted to include both affirmative misrepresentations of fact and the nondisclosure of material facts. Similarly, the United State Supreme Court's decision in *FTC v. Colgate-Palmolive Co.*, *supra*, 380 U.S. 374, had been in place for five years and would have informed the Legislature that the term "deceptive act" used in a federal statute had been interpreted to encompass the nondisclosure of material information. (*Id*. at p. 390.)

### 6. Subsequent Judicial Decisions and Amendments of the CLRA

Another principle of statutory construction provides that courts generally presume "the Legislature is aware of court opinions existing at the time it amends legislation." (*Estate of Burden* (2007) 146 Cal.App.4th 1021, 1030.) Under this principle, when the Legislature reenacts the statute without changing the interpretation given to the statute by the courts, the Legislature is presumed to have been aware of, and acquiesced in, the courts' construction of that statute. (*People v. Bouzas* (1991) 53 Cal.3d 467, 475.) This principle is applicable because of case law stating nondisclosures or omissions are actionable under the CLRA and the many times the statute has been amended without contradicting this interpretation.

The first published case to discuss whether the suppression or omission of facts was actionable under the CLRA was the Third District's 1975 decision in *Outboard*

---

**14** The view that the words "representing" and "misrepresenting" have a plain meaning that is limited to written and oral statements of fact and excludes omissions and nondisclosures is an attempt to adopt a distinction as the *only* reasonable interpretation when the distinction itself was rejected long ago. Moreover, we have found no published California decision stating "representing" has a plain meaning (i.e., is not ambiguous).

*Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30 (*Outboard Marine*).  The court referred to (1) California precedent stating fraud or deceit included the suppression of a fact by one bound to disclose it or by one who states other facts that are likely to mislead without a disclosure of the suppressed fact; (2) the statement from *General Acc. etc. Corp. v. Indus. Acc. Com., supra,* 196 Cal. at page 190, that concealment of a material fact and misrepresentation of a material fact, in legal effect, was the same thing, fraud; and (3) a legal encyclopedia stating "'the distinction between concealment and affirmative misrepresentation is tenous'" because the force and effect is the same. (*Outboard Marine*, *supra*, at p. 37.)  Ultimately, the court concluded there were no demonstrable differences between the allegation in the plaintiff's causes of action for misrepresentation and for concealment as the particular affirmative misrepresentations worked to conceal true facts about the off-road vehicle's braking and handling.  (*Ibid*.) Consequently, the court's discussion of material omissions of fact was not necessary to its conclusion that "[t]he conduct described in the first amended complaint reasonably and unquestionably falls within the activities proscribed by Civil Code section 1770." (*Id.* at p. 36.)

In *Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255 (*Bardin*), the Fourth District interpreted *Outboard Marine* as holding "that [Civil Code] section 1770 prohibited concealment or suppression of material facts: 'It is fundamental that every affirmative misrepresentation of fact works a concealment of the true fact…. [¶] Fraud or deceit may consist of the suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact.'"  (*Bardin*, *supra*, at p. 1276.)  The court then concluded the claim for violation of the CLRA failed because the pleading "neither alleged facts showing [defendant] was 'bound to disclose' its use of tubular steel exhaust manifolds, nor alleged facts showing [defendant] ever gave any information of other facts which could have the likely effect of misleading the public 'for want of communication' of the fact it used tubular steel

22.

exhaust manifolds." (*Ibid*.) Accordingly, the Fourth District affirmed the judgment entered after the trial court sustained a demurrer without leave to amend. (*Id*. at pp. 1277-1278.) We interpret *Bardin*'s statements about concealment and suppression of facts as dicta because those statements are not necessary to the decision that a cause of action under the CLRA had not been alleged.[15]

Later in 2006, the Second District filed *Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824 (*Daugherty*), which interpreted *Outboard Marine* as holding the practice proscribed by Civil Code section 1770, subdivision (a)(7) "included 'a proscription against a concealment of the characteristics, use, benefit, or quality of the goods contrary to that represented.'" (*Daugherty*, *supra*, at p. 834.) The court identified two categories of actionable nondisclosures by stating, "although a claim may be stated under the CLRA in terms constituting fraudulent omissions, to be actionable the omission must be [1] contrary to a representation actually made by the defendant, or [2] an omission of a fact the defendant was obliged to disclose." (*Id*. at p. 835.)[16] The court analyzed the particular allegations and concluded "Daugherty did not state a viable nondisclosure claim under the CLRA." (*Id*. at p. 837.) We interpret the statements in *Daugherty* about omissions and nondisclosure, like those in *Bardin*, to be dicta because they were not necessary to concluding a CLRA claim had not been alleged.

In *McAdams v. Monier, Inc.* (2010) 182 Cal.App.4th 174 (*McAdams*), the Third District referred to its 35-year-old decision in *Outboard Marine*, stating it "held that the CLRA, pursuant to its list of proscribed practices in [Civil Code] section 1770, includes

---

**15**      In some contexts, the word "holding" means "both of the result of the case and 'those portions of the opinion necessary to that result by which we are bound.' (*Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 66-67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)." (*U.S. v. Kaley* (11th Cir. 2009) 579 F.3d 1246, 1253, fn. 10.) We use the word "necessary" in this sense.

**16**      The issues raised in this appeal are related to the second category. Therefore, the first category is not discussed in detail.

23.

the concealment or suppression of material facts." (*Id*. at p. 185.) The Third District also stated the decision in *Bardin* "illustrates how *Outboard Marine* applies to an alleged misrepresentation under the CLRA that comprises a failure to disclose." (*McAdams*, *supra*, at p. 185.) In *McAdams*, the Third District concluded the plaintiff's CLRA cause of action, which was based on an alleged failure to disclose known information about the erosion of color composition of roof tiles represented to have a 50-year life span, was suitable for class treatment. (*Id*. at p. 186.) As a result, the court reversed the order denying certification of the proposed CLRA and UCL classes. (*McAdams, supra,* at p. 192.) We interpret the statement in *McAdams* about failures to disclose being actionable under the CLRA as being necessary for the disposition, which allowed certification of the CLRA claims based on failures to disclose.

In *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342 (*Klein*), the plaintiffs sued a company for selling motor fuel to consumers without (1) adjusting for temperature expansion of the fuel or (2) disclosing the effect of temperature increases on motor fuel. (*Id*. at p. 1353.) The plaintiffs alleged specific acts and omissions that constituted violations of the UCL and qualified as misrepresentations as to the characteristics and quantities of motor fuel in violation of Civil Code section 1770, subdivision (a)(5). The Second District stated:

> "Plaintiffs' allegations are sufficient to state a CLRA claim predicated on a material omission, which "'consist[s] of the suppression of a fact by one who ... gives information of other facts which are likely to mislead for want of communication of that fact.'" (*McAdams*, *supra*, 182 Cal.App.4th at p. 185, italics omitted.)" (*Klein*, *supra*, at p. 1383.)

We interpret *Klein*'s statements about omissions of material fact to be necessary to the outcome of reversing the judgment on the pleadings.[17] (Cf. *Rubenstein v. The Gap,*

---

[17] In *Daniel v. Ford Motor Co.* (9th Cir. 2015) 806 F.3d 1217, the Ninth Circuit cited *Klein* for the legal conclusion that fraudulent omissions are actionable under both the CLRA and the UCL. (*Daniel, supra,* at p. 1225.) The Ninth Circuit reversed the grant of summary judgment on CLRA and UCL claims, concluding the genuine issue of material

24.

*Inc.* (2017) 14 Cal.App.5th 870, 881 (*Rubenstein*) [statement that material nondisclosures are actionable under the CLRA was dicta because it was not necessary to conclusion that plaintiff had failed to allege a claim under CLRA].)

The line of cases beginning with *Outboard Marine*, including *McAdams*, and ending with *Klein* is relevant to our interpretation of the CLRA provisions because the Legislature amended Civil Code section 1770 many times after *Outboard Marine* and before *McAdams* and did not address the interpretation of that section to reach omissions or nondisclosures of material facts. (See 2 Stats. 1979, ch. 819, § 4, pp. 2827-2828; 2 Stats. 1984, ch. 1171, §1, pp. 4013-4014; 3 Stats. 1986, ch. 1497, § 1, pp. 5368-5369; 5 Stats. 1990, ch. 1641, § 1, pp. 7852-7853; 1 Stats. 1995, ch. 255, § 2, pp. 878-879; 3 Stats. 1996, ch. 684, § 1, pp. 3777-3780.) Similarly, since *McAdams* was decided, there have been many amendments to Civil Code section 1770 without the Legislature expressing its disapproval of the interpretation extending its provisions to omissions or nondisclosures. (See Stats. 2008, ch. 479, § 1; Stats. 2009, ch. 140, § 26; Stats. 2011, ch. 79, § 1; Stats. 2012, ch. 653, § 1; Stats. 2013, ch. 541, § 1; Stats. 2015, ch. 246, § 1; Stats. 2016, ch. 86, § 19.)

### 7.    *National Consumer Act*

Another type of analysis used when interpreting the CLRA is comparing the provisions adopted by the Legislature to the model legislation upon which the CLRA was based—namely, "the National Consumer Act proposed by the National Consumer Law Center at Boston College. (Assem. Com. on Judiciary, analysis of Assem. Bill No. 292 (1970 Reg. Sess.) Apr. 20, 1970, p. 1; see Reed, *Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act* (1971) 2 Pacific L.J. 1, 11.)" (*Fairbanks v. Superior Court* (2009) 46 Cal.4th 56, 61.) In *Fairbanks*, the Supreme

---

fact existed as to whether the plaintiffs in fact relied on Ford's omissions when they purchased a Ford Focus.

Court used this comparative analysis to support the interpretation that life insurance was not a "good" or a "service" covered by the CLRA. (*Fairbanks, supra,* at p. 61.) After determining those terms were ambiguous, the court resolved the ambiguity by noting the Legislature had omitted the reference to insurance in the definition of "services" proposed in the model act. (*Ibid.*) The court concluded the Legislature's omission indicated its intent not to treat insurance as a service under the CLRA. (*Fairbanks, supra,* at p. 61.)

Here, a comparison of the model act to the CLRA shows that paragraphs (5), (7) and (9) of subdivision (a) of Civil Code section 1770 track verbatim the paragraphs (e), (g) & (i) of Section 3.201(1) of the National Consumer Act, first final draft (Jan. 1970). However, the 16 types of unfair or deceptive acts or practices made unlawful by Civil Code section 1770, did not include the last two listed in the model act, which stated: "(q) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding; or [¶] (r) Engaging in any act or practice which is unfair or deceptive to the consumer." These provisions were general in scope and could have been interpreted as encompassing omissions of material facts not covered by the provisions referring to "representing" and "advertising."

A number of other aspects of the National Consumer Act might merit discussion here if we were the first court to interpret the CLRA. However, those aspects are of less significance in view of the judicial decisions and amendments to the CLRA that have occurred over the last 45 years.

### 8. *Omissions of Material Fact are Actionable Under the CLRA*

Based on the statutory text, legislative history (which includes the National Consumer Act), the judicial decisions and statutes that existed when the CLRA was enacted, the subsequent case law, and the many amendments to the CLRA from 1975 through 2016, we join *Klein*, *McAdams* and the other cases concluding that failures to

disclose material facts are actionable under the CLRA. In particular, we conclude paragraphs (5), (7) and (9) of subdivision (a) of Civil Code section 1770 proscribe material omissions in certain situations.

Not every omission or nondisclosure of fact is actionable. Consequently, we must adopt a test identifying which omissions or nondisclosures fall within the scope of the CLRA. Stating that test in general terms, we conclude an omission is actionable under the CLRA if the omitted fact is (1) "contrary to a [material] representation actually made by the defendant" or (2) is "a fact the defendant was obliged to disclose." (*Daugherty*, *supra*, 144 Cal.App.4th at p. 835; see *Rubenstein*, *supra*, 14 Cal.App.5th at p. 881; *Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 255 (*Collins*).) Under the facts alleged in this case, we are concerned only with the second type of omitted fact and the question of whether CarMax had a duty to disclose a fact not made known to the plaintiff.

In *Collins*, the court identified four situations in which a failure to disclose a fact constitutes a deceptive practice actionable under the CLRA. (*Collins*, *supra*, 202 Cal.App.4th at p. 255.) Those situations arise when the defendant is plaintiff's fiduciary, when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff, and when the defendant actively conceals a material fact. In addition, the duty to disclose exists "when the defendant makes partial representations that are misleading because some other material fact has not been disclosed." (*Ibid*.) In the context of the CLRA, a fact is "material" if a reasonable consumer would deem it important in determining how to act in the transaction at issue. (*Collins*, *supra,* at p. 256.) In other words, a defendant has a duty to disclose when the fact is known to the defendant and the failure to disclose it is "'misleading in light of other facts … that [the defendant] did disclose.'" (*Klein*, *supra*, 202 Cal.App.4th at p. 1382; see Civ. Code, § 1710, subd. 3.)

27.

### 9. *Duty to Disclose Safety Concerns*

A legal question presented in this appeal is whether an *independent* duty of disclosure is imposed on retail sellers of automobiles when the fact omitted implicates safety concerns. As an alternative to characterizing the disclosure of safety concerns as an independent duty, it can be viewed as a specific application of the duty to disclose (1) when defendants have exclusive knowledge of material facts not known or reasonably accessible to the plaintiff or (2) when defendants make partial representations that are misleading because some other material fact has not been disclosed. (*Collins*, *supra*, 202 Cal.App.4th at p. 255; *Smith v. Ford Motor Co*. (N.D.Cal. 2010) 749 F.Supp.2d 980, 987; see *Oestreicher v. Alienware Corp.* (9th Cir. 2009) 322 Fed.Appx. 489, 493 [CLRA, UCL and fraudulent concealment claims dismissed; plaintiff had not alleged the defect posed a threat to his safety or the safety of others].)

The possibility of a duty to disclose safety defects was raised in *Bardin*, *supra*, 136 Cal.App.4th 1255, where the plaintiffs attempted to state UCL and CLRA claims by alleging the defendant manufacturer failed to disclose exhaust manifolds were made of tubular steel instead of more durable and more expensive cast iron. (*Bardin, supra,* at p. 1260.) The trial court sustained the manufacturer's demurrer and the Fourth District affirmed. In rejecting various legal theories not supported by the allegations, the Fourth District stated the plaintiffs had not alleged "any personal injury or safety concerns related to [the manufacturer's] use of tubular steel exhaust manifolds." (*Id*. at p. 1270.) This was the opinion's only reference to "safety."

In *Daugherty*, *supra*, 144 Cal.App.4th 824, the Second District addressed whether Honda had a duty to disclose an alleged engine defect. The court concluded no duty existed despite the allegation that Honda knew at the time of sale there was an unreasonable risk of potential serious damages—specifically, the cost of repairs in the event the alleged engine defect ever caused an oil leak. (*Id*. at pp. 836-837.) The court discussed safety concerns in greater detail than in *Bardin*, but also concluded a claim

28.

under the CLRA had not been stated because the complaint was "devoid of factual allegations showing … any safety concerns posed by the defect." (*Daugherty, supra,* at p. 836.) In sum, neither *Bardin* nor *Daugherty* actually held sellers of automobiles are subject to an independent duty to disclose safety concerns. Rather, the references to safety concerns in those opinions appear in dicta.

In *Mui Ho v. Toyota Motor Corp*. (N.D.Cal 2013) 931 F.Supp.2d 987 (*Mui Ho*), the federal district court stated *Daugherty* and a 2007 federal case following *Daugherty* "held that a fact can give rise to a duty to disclose and an actionable omission if it implicates safety concerns that a reasonable consumer would find material. [Citations.]" (*Mui Ho*, *supra,* at p. 997.) The district court described this conclusion as "a basic rule of California law." (*Ibid*.) The court also stated that simply invoking the word "safety" was insufficient to establish a duty to disclose and "plaintiffs must still plead facts showing a material safety defect." (*Ibid*.) Next, the court considered the plaintiffs' allegations regarding the headlamp flickering or going out at night or during inclement weather and determined the allegations were sufficient to establish a duty to disclose because the alleged defect put the car's driver in danger. (*Id.* at pp. 997-998.) In comparison, the court referred to a case where the plaintiffs had failed to adequately plead a safety defect because they had not shown how problems with the car ignition lock affecting the driver's ability to start or shut off the car's engine posed an unreasonable safety hazard. (*Id*. at p. 997, citing *Smith v. Ford Motor Company*, *supra*, 749 F.Supp.2d 980, affd. mem. (9th Cir. 2011) 462 Fed.Appx. 660, 663 [no duty to disclose failure rate of ignition locks].)

Based on our examination of the federal and Court of Appeal decisions discussing safety concerns, we conclude there is no independent duty to disclose such concerns. Rather, a duty to disclose material safety concerns "can be actionable in four situations: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when

the defendant actively conceals a material fact from the plaintiff; or (4) when the defendant makes partial representations but also suppresses some material fact." (*Mui Ho*, *supra*, 931 F.Supp.2d at p. 996.) In *Mui Ho*, the plaintiffs alleged the failure to disclose facts about the headlamps was "actionable because (1) Defendants had exclusive knowledge of the material fact that the headlamps were defective, or, alternatively, (2) Defendants actively concealed that material fact." (*Id*. at pp. 996-997.) Thus, *Mui Ho* does not establish the existence of an independent duty to disclose safety concerns that exists outside the four situations where a duty to disclose is recognized by California courts.

### B.     Duty to Disclose Element

The foregoing discussion addressed the substantive principles pertaining to nondisclosures of fact actionable under the CLRA and the circumstances that must exist for the defendant to have a duty to disclose a material fact. Here, we consider the procedural rules that govern the proper pleading of a claim under the CLRA based on a breach of a duty to disclose a material fact.

#### 1.     *Specificity of the Pleading*

A general rule of pleading in civil cases is that "the complaint should set forth the ultimate facts constituting the cause of action, not the evidence by which plaintiff proposes to prove those facts." (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 212 (*Committee*).) An exception to this general rule requires fraud to be pled specifically, which necessitates pleading facts which show how, when, where, to whom and by what means the representations were tendered. (*Robinson Helicopter Co., Inc. v. Dana Corp*. (2004) 34 Cal.4th 979, 993.)

The application of the general rule and its exception to claims under the CLRA and UCL asserting deceptive acts or practices based on fraud-like allegations of concealment or a failure to disclose material facts is not entirely clear. For example, in

30.

*Committee*, the Supreme Court stated: "The requirement that fraud be pleaded with specificity, discussed in part III of this opinion, does not apply to causes of action under the consumer protection statutes." (*Committee*, *supra*, 35 Cal.3d at p. 212, fn. 11.) Fifteen years later, the Supreme Court rejected an insurance company's argument "that, because the potential scope of UCL liability is very broad, particularized fact-pleading should be required in UCL claims." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 46.) The court reiterated "that fraud is the only remaining cause of action in which specific pleading is required." (*Id.* at p. 47; see *Morgan v. AT&T Wireless Services, Inc.* (2009) 177 Cal.App.4th 1235, 1256 [under the fraudulent business practices prong of the UCL, actual falsity and reasonable reliance are not required to be pleaded with specificity].) In comparison, the Second District stated "[a] plaintiff alleging unfair business practices under [the Unfair Practices Act] must state with reasonable particularity the facts supporting the statutory elements of the violation." (*Khoury v. Maly's of California, Inc.* (1993) 14 Cal.App.4th 612, 619.) Based on the foregoing, we conclude causes of action under the CLRA and UCL must be stated with reasonable particularity, which is a more lenient pleading standard than is applied to common law fraud claims.

### 2. Sufficiency of Gutierrez's Allegations

We conclude Gutierrez's allegations are sufficient to establish CarMax had a duty to disclose the existence of the recall and the fact that the Hyundai's stop lamp switch had not been replaced in accordance with the recall.

First, the complaint alleged (1) the recall related to the stop lamp switch, which was a critical safety-related component of the vehicle's braking system, and (2) it was unsafe to operate a vehicle with a defective stop lamp switch. Also, the name of the part, "stop lamp switch," reasonably supports the inference that the malfunctioning of the part will affect the operation of the vehicles brake lights, which are an important safety-

31.

related feature that alerts other drivers the vehicle is braking and thereby reduces the risk of a rear end collision. (See 49 C.F.R. § 571.108 [federal motor vehicle safety standards use the term "stop lamp"].) Therefore, the complaint adequately alleges facts about the stop lamp switch that implicate safety concerns and would be important to the reasonable consumer considering whether to buy the Hyundai.[18] Accordingly, we conclude the factual allegation are sufficient to establish the "materiality" of the facts about the recall and the vehicle that CarMax did not disclose.

Of course, materiality usually is a question of fact. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977.) In certain cases, a court can determine the factual misrepresentation or omission is so obviously unimportant that the jury could not reasonably find that a reasonable person would have been influence by it. (*Ibid*.) At the pleading stage of this case, we cannot determine as a matter of law that the nondisclosure of the recall information was obviously unimportant. Therefore, we cannot uphold the order sustaining the demurrer to the CLRA claim on the ground that the materiality of the omitted fact was inadequately pleaded.

Second, the complaint alleged facts relevant to establishing a duty to disclose the material information by alleging the stop lamp switch was "a critical safety related component of the Hyundai braking system" and sales staff advised Gutierrez "that the Hyundai was in excellent condition since it passed a rigorous 125-point quality inspection." A copy of the inspection certificate was attached to the complaint and it listed specific points relating to both the vehicle's brake system and its lighting system, with "Brake lights" one of the specific 125 points inspected. The complaint also alleged

---

[18] These facts are "intrinsic" to the particular vehicle sold to Gutierrez and do not relate to "extrinsic" matters. (See Wonnell, *The Structure of a General Theory of Nondisclosure* (1991) 41 Case W. Res. L.Rev. 329, 332 [the law tends to take a stricter position regarding the nondisclosure of intrinsic facts, which pertain to the item being sold and not the general environment affecting the economic value of the item].)

CarMax engaged in misleading business practices by representing the vehicle passed a rigorous 125-point quality inspection, but not disclosing the vehicle was subject to a safety recall. A duty to disclose cannot exist if the defendant was not aware of the facts that were not disclosed. Here, the complaint did not specifically allege CarMax knew of the safety recall and that the stop lamp switch on the Hyundai had not been replaced in accordance with the recall notice. However, we conclude the facts alleged are sufficient to reasonably infer CarMax's knowledge. For instance, the complaint alleges the *only* reason CarMax did not disclose the recall or have the recall work performed was CarMax deemed making money more important than protecting its customers from dangers relating to serious safety recalls. As the lack of knowledge would be a separate reason for not disclosing the recall, it is reasonable to infer from this allegation that CarMax actually knew of the recall. (See Code Civ. Proc., § 452 [construction of pleadings].)

We conclude these allegations are sufficient to plead the existence of a duty to disclose information about the safety recall on the ground CarMax made partial representations about the vehicle's braking and lighting systems and those representations were likely to mislead for want of communication of the facts about the recall. (See *Klein*, *supra*, 202 Cal.App.4th at p. 1382; Civ. Code, § 1710, subd. 3.)

    C.    "Any Damage" Element of a CLRA Claim

        *1.*    *Legal Principles*

The CLRA authorizes any consumer "who suffers any damage" because of a unlawful method, act or practice to bring an action for various forms of relief, including (1) actual damages, (2) an order enjoining the methods, acts, or practices, (3) restitution of property, (4) punitive damages, and (5) any other relief the court deems proper. (Civ. Code, § 1780, subd. (a).) "This statutory language makes clear that, to obtain relief under the CLRA, [Gutierrez] must have suffered some damage caused by a practice deemed

unlawful under Civil Code section 1770." (*Steroid Hormone Product Cases* (2010) 181 Cal.App.4th 145, 156.)

Accordingly, a plaintiff pursuing a CLRA action must plead facts showing he or she suffered "any damage" as that phrase is used in Civil Code section 1780, subdivision (a), which is not synonymous with "actual damages" and may encompass harms other than pecuniary damages. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 640 (*Meyer*).)[19] In *Steroid Hormone Product Cases*, a plaintiff "alleged in this case that, in reliance on [defendant's] deceptive conduct, he bought an illegal product he would not have bought had he known it was illegal. He does not seek actual damages, but instead seeks restitution." (*Steroid Hormone Product Cases*, *supra*, 181 Cal.App.4th at p. 156.) The court concluded (1) the plaintiff had stated a claim under the CLRA, (2) he could represent the class, and (3) the trial court erred in denying class certification of the CLRA claim. (*Id*. at p. 157.)

### 2. Gutierrez's Allegations

Paragraph 13 of the complaint alleges that if Gutierrez "had known the true condition, including recall history, of the Hyundai before the purchase, she would not have purchased it." Gutierrez incorporated this paragraph into her eighth cause of action, which alleged violations of the CLRA. Paragraph 77 of the complaint, which is part of the CLRA cause of action, alleges Gutierrez is entitled to various forms of relief, including an injunction and "restitution of property."

---

[19] CarMax interprets *Meyer* to mean Gutierrez must "allege facts showing that she suffered the requisite actual damage." We disagree with this interpretation and read Civil Code section 1780 and *Meyer* as requiring an allegation of "any damage," which is a broad category that includes "actual damage." (*Meyer*, *supra*, 45 Cal.4th at p. 640; see Civ. Code, § 1780, subd. (a)(1) [actual damages].)

### 3. *Application of Legal Principles to Facts Alleged*

Gutierrez's allegations that she would not have purchased the Hyundai if she had known its recall history and her request for restitution adequately alleged that she suffered "any damage" as that phrase is used in Civil Code section 1780, subdivision (a). The same type of damage was alleged by the plaintiff in *Steroid Hormone Product Cases*, and that plaintiff was granted class certification of a CLRA claim. (*Steroid Hormone Product Cases*, *supra*, 181 Cal.App.4th at pp. 156-157.) In other words, we interpret *Steroid Hormone Product Cases* to mean an allegation that the plaintiff would not have purchased the goods if he or she had known the undisclosed information, is sufficient to allege the purchaser suffered "any damage." Therefore, we conclude Gutierrez adequately alleged the any-damage element of a CLRA claim.

CarMax contends we are required to find as a matter of law that the Gutierrez did not experience "any damage" for purposes of Civil Code section 1780, subdivision (a) because the potentially defective part (i.e., the stop lamp switch on the Hyundai) was replaced without charge. CarMax, however, has cited no authority for the principle that replacement negates "any damage" that a consumer might have experienced and thereby precludes the consumer from pursuing an injunction or restitution under Civil Code section 1780, subdivision (a)(2) & (3).[20] Furthermore, based on the timing of the replacement of the Hyundai's recalled stop lamp switch, it does not logically preclude Gutierrez from alleging and proving that the purchase would not have been made if the undisclosed information had been made known before the sale.

---

[20] For instance, CarMax did not argue Civil Code section 1782, subdivision (b) should be interpreted in this manner. That subdivision states: "Except as provided in subdivision (c), *no action for damages* may be maintained under Section 1780 if an appropriate correction, repair, replacement, or other remedy is given, or agreed to be given within a reasonable time, to the consumer within 30 days after receipt of the notice" of the alleged violations of Civil Code section 1770. (Italics added.)

In addition, the limiting language in CarMax's purchase agreement and warranty document does not preclude Gutierrez's CLRA cause of action. The CLRA expressly declares that "[a]ny waiver by a consumer" of the CLRA's provisions "is contrary to public policy and shall be unenforceable and void." (Civ. Code, § 1751.) Accordingly, we conclude the limitations in CarMax's warranty do not operate as a waiver of Gutierrez's right to obtain restitution if she proves CarMax engaged in an unlawful practice.

## IV. UNFAIR COMPETITION LAW

### A. Overview

The UCL prohibits, and provides civil remedies for, unfair competition. (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320 (*Kwikset*).) "[U]nfair competition" includes "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) The purpose of the UCL is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. (*McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, 954 (*McGill*).)

"Actions for relief pursuant to" the UCL shall be prosecuted exclusively by designated government officials "or by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." (Bus. & Prof. Code, § 17204.) The "injury in fact" and causation requirements were added by the voters in 2004 when they passed Proposition 64. (*McGill*, *supra*, 2 Cal.5th at p. 958.)

As to the relief that can be obtained in an "[a]ction for relief" pursuant to the UCL, injunctions are the primary form of relief available under the UCL to protect consumers from unfair business practices and restitution is a type of ancillary relief. (*Kwikset*, *supra*, 51 Cal.4th at p. 337.) Thus, the remedies available in a UCL action generally are limited to injunctive relief and restitution. (*Veera v. Banana Republic, LLC* (2016) 6 Cal.App.5th 907, 915.)

36.

The UCL's definition of unfair competition uses the terms "unlawful, unfair or fraudulent" in the disjunctive.  (Bus. & Prof. Code, § 17200.)  Consequently, the definition establishes three varieties of unfair competition.  (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)  By prescribing "any unlawful" business practice, the UCL borrows violations of other laws and treats them as unlawful practices that the UCL makes independently actionable.  (*Ibid.*)  Virtually any statute or regulation (federal or state) can serve as a predicate for a UCL unlawful practice cause of action.  (*Klein, supra,* 202 Cal.App.4th at p. 1383.)  Consequently, the alleged violations of Civil Code section 1770, subdivision (a)(5), (7) and (9), which are provisions of the CLRA, are sufficient to satisfy the unlawful practice variety of unfair competition under the UCL.  (See *Hale v. Sharp Healthcare* (2010) 183 Cal.App.4th 1373, 1383.)  In other words, a violation of the CLRA can serve as the predicate for a UCL cause of action.

### B.     Gutierrez Has Stated a UCL Claim

CarMax does not dispute the legal conclusion that a CLRA violation can serve as the predicate for a UCL cause of action.  Instead, CarMax appears to accept this conclusion, arguing Gutierrez's UCL claim "is substantively dependent upon the CLRA claim" and, therefore, "fails because the CLRA claim[] fails on the merits."  We reject this argument because Gutierrez's CLRA claim did not fail on its merits.  Therefore, we conclude Gutierrez has stated a cause of action for an unlawful practice that is actionable under the UCL because (1) she has alleged facts sufficient to state a cause of action for a violation of the CLRA and (2) restitution is a type of relief available under both statutes.

## DISPOSITION

The judgment is reversed.  The trial court is directed to vacate its order sustaining the demurrer without leave to amend and to enter a new order overruling the demurrer as

to the seventh (UCL) and eighth (CLRA) causes of action.  Gutierrez shall recover her costs on appeal.

_____

FRANSON, J.

I CONCUR:


_____

MEEHAN, J.

Poochigian, Acting P.J., concurring and dissenting,

I concur in the majority's conclusion that Gutierrez cannot obtain relief on her warranty claim. I respectfully dissent from the majority's conclusions with respect to plaintiff's claims under the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.; "CLRA")[1] and the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq; "UCL").[2]

Plaintiff alleges CarMax violated paragraphs (5), (7), and (9) of subdivision (a) of Civil Code section 1770. The question presented is whether these provisions of the CLRA cover omissions (i.e., the failure to provide certain information). (Maj. opn., *ante*, at pp. 14–15.)

*Plain Meaning*

Paragraph (5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have." (§ 1770, subd. (a)(5).) Paragraph (7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." (§ 1770, subd. (a)(7).) The plain meaning of these provisions is simple: You cannot lie about or misstate the listed aspects of a good, service or person.

Paragraph (9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." (§ 1770, subd. (a)(9).) The plain meaning of this provision is also simple: You cannot communicate something about a good or service in an advertisement, knowing you are not going to sell the good or service as advertised.

---

[1] All further statutory references are to the Civil Code unless otherwise noted.

[2] The majority concludes that plaintiff's CLRA claim is viable and therefore a UCL claim predicated thereon is also viable. (Maj. opn., *ante*, at p. 37.) For the reasons explained herein, the CLRA claim is not viable.

All three of these provisions tell sellers what they cannot say, not what they must say.

The majority concludes that the word "representing" is ambiguous because while it can mean "presenting written or oral statements of fact to another" it can also encompass "statements" that are "implied-in-fact or implied-in-law."[3][4] (Maj. opn., *ante*, at p. 16.) But a "statement" cannot be implied, by definition. Of course, statements can have an implied *meaning*, but this simply refers to the fact that the meaning of some statements must be ascertained through a chain of inferences. For example, it would have been arguably misleading if, in this case, CarMax had said all of their vehicles' parts are "up-to-date" at the time of sale. Identifying the statement as misleading would require more inferential steps than if CarMax had said "none of the stop lamps in our vehicles are subject to a recall." But both statements would be misrepresentations under the CLRA. However, the majority's concept of implied *statements* is entirely different, and imposes liability even when the seller makes no relevant representation whatsoever.[5] That is,

---

[3] The law deals with representations that are "implied-in-law" through the law of implied warranties.

[4] This conclusion offers no help with respect to subdivision (a)(9) which refers to "advertising" rather than "representing." No one has suggested advertising can be "implied."

[5] Yet, the majority tries to tie the duty to disclose the stop lamp switch recall to affirmative representations made by CarMax. The majority says "CarMax engaged in misleading business practices by representing the vehicle passed a rigorous 125-point quality inspection, but not disclosing the vehicle was subject to a safety recall." (Maj. opn., *ante*, at p. 33.) But how does CarMax's representation concerning the 125-point inspection impact whether it had a duty to disclose that the stop lamp switch was subject to a recall? Checking for recalls was not one of the 125 points. Representing that the vehicle passed a 125-point inspection would only be a *mis*-representation if CarMax did not actually perform the inspection or the vehicle had, in fact, failed the inspection. Consequently, the 125-point inspection cannot establish that CarMax "represent[ed] that [a] good[] … [is] of a particular standard, quality, or grade" when it is actually "of another." (§ 1770, subd. (a)(7).) The majority is creating omission liability wholly untethered from any affirmative representations.

2

liability can arise solely from the failure to disclose rather than from the misleading nature of a statement. This concept cannot be reconciled with any reasonable definition of "representation" or "statement."

In sum, the *meaning* of a statement ultimately found to be misleading may be "implied" in the sense that it is informed by context or reasonable inferences drawn the words of the statement. But implication cannot create an actionable statement or representation where none exists.

Moreover, even accepting the majority's conclusion that there are two possible ways to interpret "representing," we would still need to pick the better of the two. For this task, the majority says we must look to the statutory context. (Maj. opn., *ante*, at pp. 16–17.) But the majority appears to concede the statutory context points to my interpretation. The two contextual considerations are: (1) the enumeration of certain grounds for omission liability in subdivisions (a)(10) through (12) and (a)(20), (22); and (2) the statutory statement of the CLRA's purpose (§ 1760.) The majority acknowledges the first consideration "demonstrate[s] the Legislature was capable of explicitly addressing failures to provide information and, thus, support[s] the inference that the Legislature did not intend the provisions at issue in this appeal to reach omissions and failures to disclose information. [Citation.]" (Maj. opn., *ante*, at p. 17, fn. 10.) And the majority concludes the second consideration merely creates more "uncertainty in how to interpret the statute." (Maj. opn., *ante*, at pp. 17–18.) In sum, one contextual indicator undermines the majority's reading, and another is uncertain.

*Maxims of Statutory Construction*

If the plain meaning were not enough, trusted maxims of statutory construction confirm it. For one, " '[t]he expression of some things in a statute necessarily means the exclusion of other things not expressed.' [Citations.]" (*Dean v. Superior Court* (1998) 62 Cal.App.4th 638, 641–642.) The CLRA has 27 paragraphs detailing the practices it

3

proscribes. (§ 1770, subd. (a).) Most of the categories involve affirmative misrepresentations (including those at issue here). However, some of the categories describe failures to provide information. (E.g., § 1770, subd. (a)(11) [failing to disclose in advertisement that furniture is unassembled], (a)(12) [failing to disclose in advertisement the assembled price of furniture if available], (a)(20) [insufficient percentage mark-up price disclosures in advertisements], (a)(22) [disseminating unsolicited pre-recorded telephone messages without identification].) For example, it is a violation of the CLRA to advertise furniture "without clearly indicating that it is unassembled …." (§ 1770, subd. (a)(11).) By enumerating specific prohibited omissions, the statute necessarily excludes unlisted omissions.

Relatedly, the inclusion of statutory text in the CLRA prohibiting certain omissions demonstrates "the Legislature knew how to, but did not" (*In re Reeves* (2005) 35 Cal.4th 765, 787) include such language in paragraphs (5), (7), and (9).

Finally, interpreting the CLRA to broadly prohibit material omissions would render the specific omissions actually listed in CLRA superfluous. (See § 3541 ["An interpretation which gives effect is preferred to one which makes void."])

*Majority's Holding*

The majority says omissions are actionable under the CLRA if (1) the omitted fact is contrary to a material representation made by the defendant or (2) the defendant omits a fact he or she was obliged to disclose.[6] (Maj. opn., *ante*, at p. 26.)

---

[6] The first category does not impose omission liability at all. If a "material representation" is "contrary to" an "omitted fact," it is the *representation* that is actionable because it is untrue. That concept is consistent with the statutory text (e.g., § 1770, subds. (a)(5), (7), (9)), but it is not liability based on omission.

The second category would impose omission liability, but is inconsistent with the statutory text.

4

In arriving at this result, the majority concludes that a 1925 workers' compensation case that equated concealment with misrepresentation, "provides a basis for inferring the Legislature was aware that the CLRA's reference to "unfair or deceptive acts"[7] involving "representing" would be interpreted to include both affirmative misrepresentations of fact and the nondisclosure of material facts." (Maj. opn., *ante*, at p. 21.)  This would mean the Legislature intended to create liability for material omissions, but instead of simply including clear language covering omissions (like it did elsewhere in the statute), it obliquely referred to " 'unfair or deceptive acts' " involving "represent[ations]." (Maj. opn., *ante*, at pp. 20–21.)  I doubt the Legislature intended to create such liability "in so cryptic a fashion." (*FDA v. Brown & Williamson Tobacco Corp.* (2000) 529 U.S. 120, 160.)  The " ' "plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense …." ' " (*Chandler v. Roudebush* (1976) 425 U.S. 840, 848.)

Though the majority assures us that "[n]ot every omission or nondisclosure of fact is actionable" (Maj. opn., *ante*, at p. 27), its limitations on omission liability are illusory. The majority identifies a category of omission liability that arises whenever a defendant conceals a material fact. (Maj. opn., *ante*, at pp. 29–30.)  "[A] fact is 'material' if a reasonable consumer would deem it important in determining how to act in the transaction at issue.  [Citation.]" (Maj. opn., *ante*, at p. 27.)  It is hard to imagine many omissions that would fall outside of this expansive category.

---

[7] It does not appear the phrase "unfair or deceptive acts" has any independent effect in section 1770.  The provision reads:  "*The following* unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful:…" (§ 1770, subd. (a), italics added.)  The section then sets forth 27 paragraphs detailing certain unfair practices.  By its plain language, the CLRA does not cover every unfair or deceptive act imaginable, just those particular acts listed.

5

*Legislative History*

The majority also compares the CLRA to the model legislation on which it was based: the National Consumer Act proposed by Boston College. (Maj. opn., *ante*, at p. 25.) The National Consumer Act, like the CLRA, lists unlawful acts and practices. The National Consumer Act contained two categories the majority believes "could have been interpreted as encompassing omissions of material facts …." (Maj. opn., *ante*, at p. 26.) However, those two categories were *not included* in the CLRA. That is, the CLRA specifically excluded categories that might support omission liability.

The majority admits that the remainder of the legislative history cuts both ways. (Maj. opn., *ante*, at pp. 17–18.) Even if that were not the case, the legislative history would be of limited utility. Only "the language of the statute itself that has successfully braved the legislative gauntlet. It is that language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed 'into law' by the Governor. The same … scrutiny does not befall the committee reports, caucus analyses, authors' statements, legislative counsel digests and other documents which make up a statute's 'legislative history.' " (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238.)

*Legislative Inaction*

The majority also observes that several appellate cases have indicated the CLRA imposes liability for certain omissions and the Legislature has not amended the statute to contradict those cases, despite amending the statute for other reasons.

Legislative inaction is not enough to overcome the statute's plain meaning, which is confirmed by several maxims of statutory construction. Moreover, our Supreme Court recently observed that "[a]rguments based on supposed legislative acquiescence rarely do

6

much to persuade.  [Citation.]"  (*Scher v. Burke* (2017) 3 Cal.5th 136, 147.)  At best, legislative inaction merely demonstrates that *subsequent* legislatures – rather than the *enacting* legislature – approve of the status quo.  At worst, inaction does not reflect *any* legislature's approval of the status quo, but instead may result from the legislature's "inability to agree upon how to alter the status quo, unawareness of the status quo, indifference to the status quo, or even political cowardice."  (*Johnson v. Transportation Agency* (1987) 480 U.S. 616, 672, (Scalia, J., dissenting), numbering removed.)

*Impact on Merchantability Law*

None of this is to say the law should ignore businesses selling unsafe vehicles as long as they do not lie about it.  But absent a misrepresentation by the seller, such claims are not addressed by the CLRA, but instead by other bodies of law, including the implied warranty of merchantability.  (See *Brand v. Hyundai Motor America* (2014) 226 Cal.App.4th 1538, 1547; *Isip v. Mercedes-Benz USA, LLC* (2007) 155 Cal.App.4th 19, 27.)  Merchantability jurisprudence, which has evolved over several decades, strikes a delicate balance between honoring certain consumer expectations while also placing reasonable limitations on sellers' liability.  For one, the implied warranty of merchantability provides for a " 'minimum level of quality' " but it "does not 'impose a general requirement that goods precisely fulfill the expectation of the buyer.' " (*American Suzuki Motor Corp. v. Superior Court* (1995) 37 Cal.App.4th 1291, 1296.) Moreover, the duration of the implied warranty of merchantability can be limited to the duration of an express warranty, so long as the duration is reasonable and longer than the statutory minimum.  (§ 1791.1.)

The best way to harmonize the CLRA with implied warranty jurisprudence is to adopt the plain meaning of "representing" in the CLRA.  Implied warranty law addresses the situation of goods failing to meet minimum levels of merchantability, regardless of

7

what the seller did or did not say; and the CLRA, with its threat of punitive damages, steps in only when the seller acts deceptively.

By creating expansive omission-based liability under the CLRA, the majority is supplanting implied warranty law and upsetting the delicate balance it achieves.

*Conclusion*

In sum, the CLRA applies only to misrepresentations and specific, inapplicable omissions. Since the operative complaint does not successfully allege any affirmative misrepresentations under CLRA,[8] the sustaining of the demurrer should be upheld.

---

[8] The complaint asserts that CarMax "represent[ed] that the vehicle passed a rigorous 125-point quality inspection, but at the same time [did] not check[] or disclos[e] that [] the vehicle was the subject of a safety recall." This does not describe a misrepresentation because the 125-point inspection does not indicate that potential safety recalls would be researched or disclosed. As a result, the inspection certification does not constitute a representation that the vehicle has "characteristics … uses, benefits" that it does not actually have. (§ 1770, subd. (a)(5).) Instead, the representation was that the vehicle had a specific characteristic/benefit: It passed a 125-point inspection. Nor does the inspection certification constitute a representation that the vehicle was "of a particular standard, quality or grade" when it is actually "of another" (§ 1770, subd. (a)(7).) Finally, the inspection certification does not evidence an "intent not to sell [the vehicle] as advertised" (§ 1770, subd. (a)(9)), because there is nothing to suggest the vehicle was advertised as being free from parts subject to recall.

The CLRA cause of action also asserts that CarMax "indicat[ed] that the vehicle had passed a rigorous 125-point quality inspection, when in fact that vehicle had multiple mechanical problems with resulted in, among other things, a transmission replacement only one month after the vehicle purchase." Again, this does not describe a misrepresentation. Representing that the vehicle passed a 125-point inspection would only be a *mis*-representation if CarMax did not actually perform the inspection or the vehicle had, in fact, failed the inspection. The complaint alleges neither. Instead, it says that in spite of CarMax's inspection and certification, the vehicle suffered from mechanical problems. At most, this allegation suggests that either CarMax missed something during the inspection or the vehicle's problems were undetectable by CarMax's inspection. Either way, there is no claim CarMax failed to perform the inspection and thus no misrepresentation. (See *Davis v. Ford Motor Credit Co. LLC* (2009) 179 Cal.App.4th 581, 599 [when a representation is "correct," it is "not a misrepresentation."]) In other words, the complaint "does not allege a single affirmative

8

I respectfully dissent from the majority's contrary conclusion.


_____
Poochigian, A.P.J.

---

representation … other than a true one ….” (*Rubenstein v. The Gap, Inc.* (2017) 14 Cal.App.5th 870, 881.)